**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CARMEN CIOTOLA, as assignee** : | |
| **of QUARTERBACK** | |
| **TRANSPORTATION, INC.,** : | |
| **Plaintiff** : | **CIVIL ACTION NO. 3:21-1020** |
| **v.** : | **(JUDGE MANNION)** |
| **RSA INSURANCE GROUP, PLC,** : | |
| ***et al.,*** | |
| : | |
| **Defendants** | |

## <u>MEMORANDUM</u>

Pending before the court is plaintiff Carmen Ciotola's request to re-open this matter following the completion of arbitration in order to proceed with his claims for breach of contract and bad faith. (**Doc. 24**). For the reasons that follow, Plaintiff's request will be **DENIED**.

## I.    <u>Factual and Procedural Background</u> [1]

On June 9, 2021, plaintiff Carman Ciotola filed this insurance action as the alleged assignee of Quarterback Transportation, Inc., ("Quarterback"), a

---

[1] The full background of this case can be found in the court's 2020 Memorandum in civil action 19-cv-753, M.D. Pa., denying plaintiff's and Quarterback's cross-motions for summary judgment, *see Ciotola v. Star Transportation & Trucking, LLC,* 481 F.Supp.3d 375 (M. D. Pa. 2020).

Canadian policyholder, against defendants RSA Insurance Group, PLC, now known as RSA Insurance Group Limited, and two of its subsidiaries, Royal and Sun Alliance Insurance Company of Canada and Royal and Sun Alliance Insurance Agency, Inc. (herein collectively referred to as "RSA" or "Defendants"). While the court will not recite the full background in detail, a brief summary of the events leading up to this request is necessary to better understanding the court's discussion.

The underlying dispute in this case stems from a motor vehicle accident that occurred on November 12, 2018, in Luzerne County, Pennsylvania, between Ciotola and Quarterback. At the time of the accident, Quarterback had a $7,000,000 primary insurance policy with Chubb Insurance Company and a $1,000,000 policy of excess liability coverage with RSA under the Comprehensive Logistics Policy, CLP 0070, ("RSA Policy"). Subsequently, Ciotola filed a personal injury action against Quarterback.

According to the complaint in the instant matter, RSA breached its duties under the RSA policy by failing to assign counsel or defend the interests of Quarterback against Ciotola's lawsuit. (Doc. 1., ¶ 83). After several failed attempts to negotiate, Ciotola demanded the full $1,000,000 excess policy held by RSA. *Id*., ¶ 84-87. When it became clear that RSA had no intention of entertaining Ciotola's demands, Quarterback settled with

Ciotola by consenting to a judgement against it for $9,000,000 and transferring any potential claims it had against RSA under the RSA policy to Ciotola through an Assignment Agreement. (Doc. 24, p. 7-8). Quarterback also agreed to pay Ciotola $500,000 after the consent judgement was entered. *Id*. In return, Ciotola agreed not to enforce the $9,000,000 consent judgement against Quarterback. *Id*.

Utilizing the rights transferred by the Assignment Agreement, Ciotola brought this against RSA for bad faith and breach of contract. In response, RSA filed a joint motion to compel Ciotola to proceed with arbitration to resolve his claims in accordance with the arbitration clause in the RSA policy. (Doc. 11). This court granted RSA's motion, issuing an order to stay Ciotola's claims pending arbitration and administratively closing the case. (Doc. 23).

On February 21, 2025, Arbitrator Scott W. Densem rendered his findings. (Doc. 24). Notably, it was Quarterback, rather than Ciotola, who initiated this arbitration against RSA. In his decision, Mr. Densem found that the Assignment Agreement between Quarterback and Ciotola was "a nullity" and that it "has no legally binding effect on RSA". *Id*., at 17. He further found that Quarterback was entitled to indemnity under the RSA policy for the $500,000 amount that it paid to Ciotola as part of their Settlement Agreement. *Id*., at 126.

- 3 -

Thereafter, Ciotola filed the instant request to re-open this case in order to proceed with his claims for bad faith and breach of contract against RSA. However, given the Arbitrator's findings that the Assignment Agreement was legally invalid, it was unclear how Ciotola had standing to proceed with his claims against RSA. Thus, the court ordered the parties to brief this issue. (Doc. 26). Ciotola's brief was filed on June 2, 2026. (Doc. 27). On June 16, 2026, RSA filed its brief in opposition, (Doc. 28), to which Ciotola filed a reply. (Doc. 29). The matter is now ripe for review.

## II.   **Discussion**

Initially, the parties dispute whether Ciotola's instant claims of bad faith and breach of contract should have been resolved through arbitration. The parties hold conflicting interpretations of the court's 2022 memorandum, (Doc. 22), and order, (Doc. 23), concerning the scope of issues subject to arbitration. According to Ciotola, the only issue to be resolved through arbitration was the determination of coverage under the RSA policy, while the remaining claims for bad faith and breach of contract were stayed for future litigation pending that determination. (Doc. 27, p.2). However, a complete reading of the court's memorandum and order makes it clear that all of Ciotola's claims were to be resolved through arbitration.

In support of his position, Ciotola states that "a simple review of the terms of the Dispute Resolution/Arbitration Clause in the RSA policy confirms that [he] was not required to arbitrate his bad faith claims in Canada" as it only covers claims related to coverage. (Doc. 22, p. 1-2). However, this argument fails to acknowledge the court's findings that Ciotola's instant claims *were* related to coverage. For instance, at the end of the court's discussion, the court explicitly categorized Ciotola's instant claims as coverage disputes, stating:

> In short, since Ciotola avers that Quarterback assigned its rights to him under the RSA Policy, he is bound by the provision of that policy which requires that **coverage disputes under the policy, as he raises in his instant claims**, shall be resolved by arbitration in Canada.

(Doc. 22, p.6). In fact, the majority of the court's discussion was based on the question of "whether the claims Ciotola raises in his instant complaint are covered by [the arbitration clause]." (Doc. 22, p.16). While the court found that none of Ciotola's claims could proceed without a determination that the RSA Policy affords coverage, that was simply an additional factor that the court used to conclude that his claims were all within the scope of the policy. The court made this clear after analyzing each of Ciotola's claims, stating:

While Ciotola points out that insurance contracts are to be construed in favor of the insured, he neglects the well-settled case law that "regarding the scope of the arbitrable issues, a district court should resolve all doubts in favor of arbitration."

(Doc. 22, p, 23). In its entirety, the court's memorandum and order make it clear that all of Ciotola's claims were found to be covered by the arbitration clause.

Nevertheless, the court also finds that the Arbitrator's findings rendering the Assignment Agreement legally invalid leaves Ciotola without standing to bring his instant claims. According to Ciotola, this conclusion from the Arbitrator "was made in the context of *indemnity rights* under the insurance contract, and not assignment of rights to pursue claims for bad faith." (Doc. 27, p.6). However, the decision as a whole provides plenty of context to reject this. For example, when analyzing whether *Quarterback* had standing to pursue the arbitration, he stated the following:

In effect, what Quarterback did to settle the personal injury litigation was to agree to try to transfer its rights under the RSA policy to Ciotola, without guaranteeing it could validly do so. Ciotola accepted those terms. By executing the Assignment Agreement, Quarterback fulfilled its obligations pursuant to the Settlement Agreement, but there was no transfer of rights legally enforceable against RSA.

- 6 -

(Doc. 24, p.18). Further, in his analysis on the issue of whether Quarterback breached the terms of the RSA policy by assigning those policy rights to Ciotola without RSA's consent, Mr. Bensen explained that:

> Ontario law governs the interpretation of the contract between Coast/RSA and Quarterback. The assignment was not valid under the terms of the contract, nor under Ontario law, so it was a nullity. It has no legally binding effect on Coast/RSA. As I have noted, Quarterback astutely provided for this situation in the Settlement Agreement, which explicitly states that Quarterback does not guaranty to Ciotola that its attempted assignment of rights would be binding on Coast/RSA. Ciotola assumed all risk with respect to whether the assignment of rights was valid. Therefore, although Quarterback may have technically breached the RSA policy by attempting to assign its rights under the RSA policy to Ciotola, the breach has resulted in no loss or prejudice to Coast/RSA, and it is of no consequence.

(Doc. 24, p.105-106). Certainly, if Mr. Bensen's decision merely referred to the transfer of indemnity rights, and not the policy rights in general, he would not have concluded that the breach was of no consequence to RSA. Further, if Quarterback had relinquished his claims of breach of contract and bad faith through the Assignment Agreement, as Ciotola asserts, the Arbitrator would not have issued an award to Quarterback on the basis that RSA breached

- 7 -

its duties to defend and investigate under the insurance contract, as was the result.

To the extent that Ciotola argues that the transfer of policy rights under the insurance contract is unnecessary to bring his instant claims of bad faith, that argument fails as well. As RSA correctly points out in its opposition brief, "[a] plaintiff without contractual rights under the insurance policy lacks standing to pursue a bad-faith claim." (citing *Strutz v. State Farm Mut. Ins. Co.*, 609 A.2d 569, 571 (Pa. Super. 1992); *see also Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 383 (Pa. Super. 2002) (rejecting the argument that a "bad faith claim is a separate and distinct claim from the insurance policy contract claim" and therefore does not "arise under an insurance policy").

In sum, the court finds that Ciotola's claims could only proceed through a valid assignment of policy rights from Quarterback. However, it is evident from the Arbitrator's decision that the Assignment Agreement was invalid due to the non-assignment clause in the RSA policy and therefore had no legal effect. As a result, Ciotola lacks legal standing to proceed with his claims in this instant action.

## III. <u>Conclusion</u>

Accordingly, Ciotola's request to re-open this case in order to proceed with his claims of bad faith and breach of contract (**Doc. 24**) will be **DENIED**. An appropriate order follows.

<u>s/ Malachy E. Mannion</u>
**MALACHY E. MANNION**
**United States District Judge**

**DATE: March 2, 2026**
20-1020-02